Ashley R. Fickel (State Bar Number 237111)
STINSON LLP
1901 Avenue of the Stars
Suite 450
Los Angeles, California 90067
Telephone: 310.730.7020
Facsimile: 310.730.7019
ashley.fickel@stinson.com

Attorneys for Plaintiff
Lauren J. Salkin

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| LAUREN J. SALKIN, an individual,<br><br>Plaintiff,<br><br>v.<br><br>TAYLOR SHERIDAN, an individual; JOHN LINSON, an individual; ART LINSON, an individual; BOSQUE RANCH PRODUCTIONS, INC., a California corporation; LINSON ENTERTAINMENT, INC., a California corporation; PARAMOUNT GLOBAL (f/k/a Viacom CBS Inc.), a Delaware corporation; VIACOM INTERNATIONAL, INC., a Delaware corporation; 101 STUDIOS, LLC, a Delaware limited liability company; NBCUNIVERSAL MEDIA, LLC, a Delaware limited liability company; ALLIANCE ENTERTAINMENT HOLDING CORPORATION, a Delaware corporation; ELEVATE ENTERTAINMENT, LLC, a California limited liability company; and DOES 1-50,<br><br>Defendants. | Case No. 2:26-cv-9339<br><br>**COMPLAINT FOR COPYRIGHT INFRINGEMENT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, Lauren J. Salkin ("Salkin" or "Plaintiff"), by and through her attorneys of record, alleges as follows against Defendants Taylor Sheridan ("Sheridan"), John Linson ("John Linson"), Art Linson ("Art Linson"), Bosque Ranch Productions, Inc. ("Bosque Ranch"), Linson Entertainment, Inc. ("Linson Entertainment"), Paramount Global (f/k/a ViacomCBS Inc.) ("Paramount Global"), Viacom International Inc. ("Viacom"), 101 Studios, LLC ("101 Studios"), NBCUniversal Media, LLC ("NBCUniversal"), Alliance Entertainment Holding Corporation ("Alliance Entertainment"), Elevate Entertainment, LLC ("Elevate"), and Does 1-50 (collectively, "Defendants"):

## INTRODUCTION

1. This case has a straightforward chronology. Lauren Salkin spent more than a decade developing *Sovereign Nation*, a dramatic television series centered on tribal governance, casino-driven economic power, and a modern war over land and development. The federal copyright record documents successive registered versions of the project beginning in 2010. By late 2016, Salkin had completed a Pilot Script, a Show Bible, and a detailed pitch Deck; had obtained commitments from established actors and director Rodrigo García; and was actively submitting the project for production. Only then did the project reach Sheridan's representatives.




**Figure 1: Creation, registration, submission, and Yellowstone chronology (Exs. A, C, D).**

2. In late 2016 and early 2017, Salkin, directly and through her representatives, submitted *Sovereign Nation* to Taylor Sheridan's representatives at Elevate Entertainment, Sheridan's management company. The submission was documented. Elevate acknowledged receipt in writing, forwarded the submission within Elevate, and on February 1, 2017 responded on Sheridan's behalf that "Taylor thanks you very much for your interest. Unfortunately, he's unavailable for TV projects." Within months, Paramount greenlit Sheridan's *Yellowstone*.

3. Sheridan, however, was not "unavailable for TV projects." Instead, he and others used Salkin's copyrighted works to develop *Yellowstone*. On June 20, 2018, Paramount Network aired its first episode.

4. What then appeared in *Yellowstone* was not merely another Western about land or family. It included specific expressive choices already embodied in Salkin's materials: a tribal casino functioning as the institutional center of political and development power; a signature confrontation staged in the tribal chairman's casino office over expansion beyond reservation boundaries; the use of trust land, the absence of zoning restrictions, and a 99-year lease structure as the concrete mechanism for that expansion; and recurring master-plan imagery deployed to dramatize the struggle for territorial control.

5. The parallels become harder still to attribute to genre or coincidence because of the casting. Salkin's Deck depicted and proposed Danny Huston among its principal characters and prominently featured Gil Birmingham—casting selections that were not public knowledge when she submitted her materials. *Yellowstone* later cast both actors in materially parallel structural roles: Birmingham as the tribal political leader whose authority and development strategy run through the casino, and Huston as the outside development power broker who supplies the political or commercial path for that expansion.

6. Nor was the similarity apparent only to Salkin. As alleged below, Salkin separately submitted the complete *Sovereign Nation* package to HBO. A senior HBO

scripted-television executive who had received the package and later met with Salkin about the project told her that, when Sheridan's *Yellowstone* project reached him in spring 2017, he recognized its similarity to *Sovereign Nation* and terminated Sheridan's project at HBO for that reason.

7. Copyright law does not protect the abstract idea of a Western, a land dispute, an Indian casino, or a powerful family—and that is not Plaintiff's claim. The infringement alleged here lies in the copying of Salkin's particular expressive choices and their coordinated selection and arrangement: the institutional architecture of casino-centered tribal power, the specific land-development mechanisms through which that power is exercised, the construction and sequencing of key scenes, and an ensemble of characters performing parallel functions within that architecture. Those similarities are detailed below in four categories—War Over Land and Development; Casino Governance and Development; Character Function Comparisons; and General Themes, Atmosphere, and Total Concept and Feel—element by element across plot, character, scene construction, dialogue, setting, mood, pace, and sequence of events.

8. When the works are objectively compared, the same coordinated design repeatedly appears: casino-centered institutions organize political power; the same unusual land-development mechanisms propel the conflict; parallel scenes perform the same dramatic functions; and the same actors appear in materially parallel roles. These are not merely convergences of a shared genre. Taken together with access and timing, they support a strong inference of copying.

9. Defendants have exploited that expression on an extraordinary commercial scale. Since its 2018 premiere, *Yellowstone* became a top-rated television series and expanded into a franchise—*1883*, *1923*, *Marshals*, and *Dutton Ranch*—generating billions of dollars across broadcast, streaming on Paramount+ and Peacock, syndication, international distribution, advertising, and merchandising. To the extent the spinoff series incorporate the same protectable expression alleged in this Complaint, they too are infringing exploitations of Salkin's work.

10. Salkin created this world, registered it with the Copyright Office, and delivered it to Sheridan's own representatives—who acknowledged receipt, forwarded it, and turned her away. The *Yellowstone* franchise has generated billions of dollars. Salkin has received nothing. She brings this action for a judgment of infringement, for the damages and profits the Copyright Act provides, and for an end to Defendants' continuing unauthorized exploitation of her work.

## THE PARTIES

11. Salkin is an individual residing in the state of Virginia.

12. On information and belief, Defendant Sheridan is an individual residing in Texas. Sheridan was the co-creator of *Yellowstone* and received writing credits on nearly all of the episodes of *Yellowstone*. Sheridan maintains substantial and continuous business contacts with California, including through his ownership and control of Bosque Ranch Productions, Inc., a California corporation, his ongoing relationships with California-based production companies and networks, and his direction of infringing conduct toward California.

13. On information and belief, Defendant Viacom is a Delaware corporation with its principal place of business in New York, New York. Viacom operates the programming service Paramount Network, which exploits and/or broadcasts the drama series *Yellowstone*, its spinoff series *1883*, *1923*, *Marshals*, and *Dutton Ranch*, and related derivative works. Viacom also exploits the *Yellowstone* franchise through its streaming platform Paramount+ and through licensing arrangements with Peacock and other domestic and international distributors. Defendants have also exploited and distributed *Yellowstone* through digital transactional platforms, including Amazon, Apple/iTunes, Google Play, Microsoft Movies & TV, Verizon/Flexview, InDemand, and Vudu/Fandango at Home, among others, and through live television providers and streaming television bundles carrying Paramount Network.

14. On information and belief, Defendant John Linson ("John Linson") is an individual residing in California. John Linson is a co-creator and executive producer

of *Yellowstone*.

15. On information and belief, Defendant Art Linson ("Art Linson") is an individual residing in California. Art Linson is an executive producer of *Yellowstone*.

16. On information and belief, Defendant Bosque Ranch Productions, Inc. ("Bosque Ranch") is a California corporation with its principal place of business in California. Bosque Ranch is a production company involved in the production of *Yellowstone*.

17. On information and belief, Defendant Linson Entertainment, Inc. ("Linson Entertainment") is a California corporation with its principal place of business in California. Linson Entertainment is a production company involved in the production of *Yellowstone*.

18. On information and belief, Defendant Paramount Global (f/k/a ViacomCBS Inc.) ("Paramount Global") is a Delaware corporation with its principal place of business in New York, New York. Paramount Global is the parent company of Paramount Network and is involved in the production, distribution, and exploitation of *Yellowstone*.

19. On information and belief, Defendant 101 Studios, LLC ("101 Studios") is a Delaware limited liability company with its principal place of business in Texas. 101 Studios is a production company involved in the production and distribution of *Yellowstone*.

20. On information and belief, Defendant NBCUniversal Media, LLC ("NBCUniversal") is a Delaware limited liability company with its principal place of business in New York, New York. NBCUniversal is involved in the distribution and exploitation of *Yellowstone* through its streaming platforms.

21. On information and belief, Defendant Alliance Entertainment Holding Corporation ("Alliance Entertainment") is a Delaware corporation with its principal place of business in Florida. Alliance Entertainment is involved in the distribution and exploitation of *Yellowstone*.

22. On information and belief, Defendant Elevate Entertainment, LLC ("Elevate") is a California limited liability company with its principal place of business in California. Elevate represented Sheridan, received Plaintiff's Deck and related *Sovereign Nation* submission on his behalf, internally forwarded the submission, and responded on Sheridan's behalf.

23. Plaintiff is informed and believes, and on that basis alleges, that at all relevant times mentioned in this Complaint, Defendants and each of them, including Does 1 through 50 whose true names and capacities are unknown to Plaintiff, were and are acting in concert and active participation with each other in committing the wrongful acts alleged herein, and were and are the agents of each other and were acting within the scope and authority of that agency and with the knowledge, consent, and approval of one another. When the true names and capacities of Does 1 through 50 are ascertained, Plaintiff will amend this Complaint accordingly.

**JURISDICTION AND VENUE**

24. This Court has personal jurisdiction over Defendants because: (a) Defendants Bosque Ranch, Linson Entertainment, and Elevate are residents of or maintain their principal places of business in the State of California, including within this District; (b) Defendants Viacom, Paramount Global, and NBCUniversal maintain substantial and continuous business operations in this District, including production facilities, corporate offices, and studio operations in Los Angeles County; (c) Defendant Sheridan has purposefully availed himself of the privilege of conducting activities in California by owning and controlling Bosque Ranch Productions, Inc., a California corporation, by developing and producing *Yellowstone* through California-based production companies and facilities, and by directing infringing conduct toward this District; (d) Defendants 101 Studios and Alliance Entertainment have purposefully availed themselves of the privilege of conducting activities in California by licensing *Yellowstone* for distribution to California consumers, generating advertising and subscription revenue from California-based viewership, and entering

into production, distribution, and licensing agreements with California-based entities; and (e) each Defendant has engaged in business activities in the Central District of California and/or has otherwise worked with companies in the Central District of California, and/or has directed its infringing conduct toward this District.

25. This Court has subject-matter jurisdiction over the Copyright Act claims pursuant to 28 U.S.C. §§ 1331 and 1338(a).

26. Venue is proper in the Central District of California under 28 U.S.C. §§ 1391 and 1400 because: (a) Defendants Bosque Ranch, Linson Entertainment, and Elevate reside in this District; (b) Defendants Viacom, Paramount Global, and NBCUniversal maintain substantial operations in this District, including production facilities and corporate offices; (c) Defendant Sheridan, while residing in Texas, transacts substantial business in this District through his ownership of Bosque Ranch Productions, Inc., and his production activities with California-based entities; (d) the infringing *Yellowstone* series was developed, produced, and broadcast from facilities located in this District; (e) a substantial portion of the nationwide exploitation of *Yellowstone*, including streaming on Paramount+ and Peacock, advertising sales, and merchandising, is directed to and causes injury to consumers and Plaintiff in this District; and (f) a substantial part of the events giving rise to this litigation, including the submission of Plaintiff's Deck and related *Sovereign Nation* materials to Elevate and the subsequent development of the infringing work, occurred in the Central District of California.

## GENERAL ALLEGATIONS

### A. Salkin Creates *Sovereign Nation*

27. Salkin is an award-winning writer and entertainment industry professional with extensive experience in journalism and documentary filmmaking. Prior to developing *Sovereign Nation*, Salkin worked as a journalist covering entertainment and culture, which provided her with deep insight into storytelling, character development, and the business of television production.

28. Beginning in 2005, Salkin became fascinated with Native American history and the modern complexities of tribal life. From 2005 to 2009, Salkin conducted extensive documentary research on Indian gaming and tribal governance, including producing "*Descendants—Native American Indians Today & The Casino*," a documentary exploring the world of Indian Gaming. This multi-year research formed the factual and dramatic foundation for what would become *Sovereign Nation*.

29. Beginning in 2010, Salkin converted content from these early stories into the form of a scripted, dramatic television series about life in and around an Indian reservation. The federal copyright record establishes continuous development of the same dramatic project under successive working titles beginning no later than 2010, including a federal copyright registration issued in March 2010 (Registration No. PAu003449777) under the working title "Descendants - Native American Indians Today & The Casino," a revised treatment registered in March 2014 (Registration No. PAu003720394), a further revision registered in February 2016 under the title "Five Stones" (Registration No. PAu003799402, whose certificate identifies the 2010 and 2014 registrations), and a registration in April 2016 under the title "*Sovereign Nation*" (Registration No. TXu002011973). On November 8, 2016, a federal copyright registration was issued for the *Sovereign Nation* pilot script - before Salkin's November 28, 2016 transmission of the materials to her agent and before the January 2017 Deck submission to Elevate. The end result of this hard work was the legally protected expression embodied in a show called *Sovereign Nation*.

30. *Sovereign Nation* is a dramatic television series that explores the world of Indian gaming and the inhabitants in and around an Indian reservation in the modern western frontier.

31. The television show centers on Dakota Vargas (proposed by Salkin to be played by Adam Beach), a ruggedly handsome half-blooded Native American who left the reservation years ago to avoid trouble with the law and who has returned to profit from Indian gaming. Unbeknownst to Dakota, he is the illegitimate son of Rich

Lyons, a larger-than-life Tribal Chairman who runs the Indian casino and who has ambitious plans to buy, develop, and profit from the land surrounding the Indian reservation by any means necessary. Dakota is pitted against his biological father in a concealed succession conflict that drives the central narrative. Along with Dakota and Rich, *Sovereign Nation* features an ensemble cast of characters—including a wealthy matriarch who controls per-capita distributions and surveils the reservation from her mansion, a volatile and brilliant female strategist, a fiercely loyal enforcer, a high-level tribal attorney, and a corporate/political antagonist—that drive the story's political, financial, legal, and territorial conflicts.

32. Beginning in April 2016, Salkin registered versions of *Sovereign Nation* and its component materials—including the pilot script ("Pilot Script"), show bible ("Show Bible"), deck ("Deck"), and treatment ("Treatment") (collectively, the "Copyrighted Materials")—with the Copyright Office. These registrations bear the following numbers, titles, and effective dates:

a. Registration No. TXu002011973, *Sovereign Nation*, effective April 12, 2016; the related deposit confirmation identifies uploaded files for a pilot script, show bible, and deck;

b. Registration No. PAu003843317, *Sovereign Nation* Pilot Script, effective November 8, 2016; Registration No. PAu003870824, *Sovereign Nation* Bible 03082017, effective August 15, 2017; and Registration No. PAu003870826, *Sovereign Nation* Pilot Script 03082017, effective August 15, 2017;

c. Registration No. TXu002115964, *Sovereign Nation*, effective September 6, 2018. True and correct copies of the certificates of registration and related registration records are attached hereto as Exhibit D and incorporated herein by reference.

**B. Salkin Submits *Sovereign Nation* to Sheridan's Representatives**

33. In 2016, Salkin obtained commitments from Rodrigo Garcia to direct the

pilot episode of *Sovereign Nation* and from Adam Beach to play the lead role of Dakota Vargas. She also began to market the *Sovereign Nation* television show to several production companies and television networks. In connection with this effort, in November 2016, Salkin and her literary agent shared the Copyrighted Materials with these production companies and television networks.

34. In or around late November 2016, Salkin began seeking Sheridan's interest in writing for *Sovereign Nation* through his representatives at Elevate. On November 28, 2016, Salkin provided her then-literary agent, Al Kumar of Deal Points Entertainment ("Kumar"), with copies of the Copyrighted Materials—the Pilot Script, Show Bible, and Deck—which together described in detail the television show concept; the first-season story arc, including synopses of key episodes; and the show's characters and proposed casting selections. Kumar contacted Sheridan's representatives at Elevate on multiple occasions, including by telephone, by an email to Sheridan's manager referenced in a January 18, 2017 text exchange, and by a written follow-up to Elevate on January 20, 2017. Kumar represented to Salkin that he had transmitted the Pilot Script, Show Bible, and Deck to Elevate and had spoken with Elevate by telephone. See Exhibit A (A-1 through A-3), which is incorporated herein by reference.

35. By January 2017, Salkin had ended her relationship with Deal Points Entertainment, as she disclosed to Elevate at the time, and was pursuing the submission directly and through her manager. On January 19, 2017, Salkin's manager, Albert Gray, spoke by telephone with Celia Thibaudat at Elevate regarding *Sovereign Nation*. On January 20, 2017, Salkin emailed Thibaudat directly, copying her entertainment counsel, Shannon Hensley, and Gray. Salkin attached the Deck and asked that the project be passed to Elevate's client Taylor Sheridan for his consideration. On January 26, 2017, Thibaudat confirmed in writing that she had received Salkin's email and forwarded it within Elevate. On information and belief, Gray thereafter transmitted the Pilot Script and Show Bible to Thibaudat. See Exhibit

A (A-4 and A-5), which is incorporated herein by reference. The Deck, Pilot Script, and Show Bible are attached hereto as Exhibit B.

36. In a February 1, 2017 email, Elevate wrote that while "Taylor thanks you very much for your interest," he would not become a writer for *Sovereign Nation* because Sheridan was "unavailable for TV projects." This written response, together with Elevate's receipt and internal forwarding of the submission, supports a reasonable inference that Sheridan had actual access to the Deck and the *Sovereign Nation* project. See Exhibit C, which is incorporated herein by reference.

**THE CHAIN OF EVENTS ESTABLISHING ACCESS**

| | | |
|---|---|---|
| Nov. 28, 2016 | **Salkin → Al Kumar (her literary agent)**<br>Pilot Script, Show Bible, and Deck sent for industry submission | Ex. A-1 |
| by Jan. 18, 2017 | **Kumar → Sheridan's manager**<br>Email referenced in contemporaneous text-message thread | Ex. A-2 |
| Jan. 19, 2017 | **Albert Gray (manager) → Celia Thibaudat (Elevate)**<br>Telephone call re Sovereign Nation | Ex. A-4 (referenced) |
| Jan. 20, 2017 | **Kumar → Elevate**<br>Written follow-up referencing the prior call re Sovereign Nation | Ex. A-3 |
| Jan. 20, 2017 | **Salkin → Celia Thibaudat (Elevate)**<br>Direct Deck submission, copying counsel Hensley and Gray, for Sheridan | Ex. A-4 |
| Jan. 26, 2017 | **Thibaudat (Elevate) → Salkin**<br>Written confirmation: received and forwarded within Elevate | Ex. A-5 |
| Feb. 1, 2017 | **Samantha Levenshus (Elevate), for Sheridan**<br>**"Taylor thanks you very much for your interest. Unfortunately, he's unavailable for TV projects."** | Ex. C |

**Figure 2: The documented access chain (Exs. A-1 through A-5, C).**

37. During the same period, Salkin submitted the complete *Sovereign Nation* package through other established industry channels and corresponded with multiple

networks that were reviewing the materials and considering the project. Salkin's first submission to HBO was made in August 2016, when her entertainment counsel transmitted the materials to an HBO development executive. Salkin and that executive corresponded over the following several months, and in February 2017 Salkin was referred to a senior executive in HBO's scripted television division. The senior executive acknowledged receipt of the full *Sovereign Nation* package in writing on February 8, 2017. On April 6, 2017, Salkin met with that executive at HBO's Los Angeles offices and pitched *Sovereign Nation*.

38. On information and belief, a different HBO executive was pushing the development of Sheridan's *Yellowstone* project in late Spring 2017. When the project came upon the desk of that same senior HBO executive for approval, that executive recognized Sheridan's materials as substantially similar to the *Sovereign Nation* materials Salkin had previously submitted and terminated Sheridan's project. In September 2022, that same senior HBO executive informed Salkin that he had terminated Sheridan's project at HBO in spring 2017 because of its similarity to her *Sovereign Nation* materials.

39. Salkin also submitted the complete *Sovereign Nation* package to multiple major networks and production companies, including Netflix, Starz, AMC, FX, Warner Bros., and Appian Way, during 2016–2017. In follow-up emails, she informed those recipients that Sheridan's representatives were considering the project.

40. Salkin never authorized Sheridan or any other party to use her creative expressions or her Copyrighted Materials.

**C. Sheridan Develops *Yellowstone* After Salkin's Submission**

41. The timing matters, and the pleaded chronology runs in only one direction. Salkin's expression came first, and the federal record proves it: the distinctive elements of *Sovereign Nation* existed in registered form—beginning with Registration No. PAu003449777, effective March 22, 2010, and culminating in the

April and November 2016 registrations covering the Pilot Script, Show Bible, and Deck—before the earliest of the pleaded *Yellowstone* development milestones. The submission came next, through the documented sequence alleged above: transmission to her then-literary agent, Kumar; Kumar's contacts with Sheridan's representatives at Elevate and his reported transmission of the materials; Salkin's direct January 2017 submission of the Deck; her manager's telephone contact with Elevate and, on information and belief, transmission of the Pilot Script and Show Bible; and Elevate's written confirmation of receipt and internal forwarding. Only then do the pleaded milestones of *Yellowstone*'s development appear: Sheridan's project reached HBO in spring 2017—where, as alleged above, an executive familiar with Salkin's materials recognized the similarity and terminated the project—and Paramount greenlit the series in May 2017, approximately three months after Elevate's written response that Sheridan was "unavailable for TV projects."

42. Salkin assumed Sheridan had simply passed. Instead, he and others were developing a television series built on the same distinctive foundations, based in whole or in part on Salkin's Copyrighted Materials. Whatever general interest in Western settings or Native American subjects Sheridan's earlier work may reflect, none of it contains the specific expression at issue in this action—the casino-office scene construction, the trust-land, no-zoning, 99-year-lease mechanism, the casting selections depicted in Salkin's Deck, or the coordinated expressive architecture alleged below. Salkin is aware of no other work in which those elements appear together as they do in her registered and submitted materials and in *Yellowstone*.

43. On June 20, 2018, Paramount Network aired the first episode of *Yellowstone*. Upon viewing the series, Salkin discovered that *Yellowstone* bears substantial and material similarities to *Sovereign Nation*—she recognized her own work. When the concrete elements of each work are objectively compared, the similarities run across plot, themes, dialogue, mood, setting, pace, characters, and sequence of events. They are not confined to abstract concepts or genre conventions;

they extend to the specific, protectable details of Salkin's expression, as alleged category by category below.

44. Even after filtering out unprotectable ideas, general genre conventions, and scènes à faire common to the modern Western or frontier drama genre, the protectable expression remaining in *Sovereign Nation* that Defendants copied includes, but is not limited to: (a) the parallel dialogue and scene construction choices, including the specific and iconic casino-office negotiation scenes and tribal council meeting sequences; (b) the distinctive dramatic deployment of a jurisdictional-leverage device—trust land, no-zoning constraints, and 99-year lease structures—used as a recurring narrative engine rather than mere background exposition; (c) a distinctive ensemble of sufficiently delineated characters performing the same narrative functions within each story's power structure; and (d) the selection, arrangement, and sequencing of those elements into the same coordinated expressive design, including the coordinated architecture of casino-centered tribal governance as the institutional seat of power, the engine of per-capita economic control, and the jurisdictional mechanism enabling development leverage. Salkin claims no copyright in trust-land status, zoning law, long-term leases, Indian gaming, or any other fact or legal doctrine standing alone. The protected expression is her original selection, arrangement, sequencing, and dramatization of those elements as story devices within the casino-centered governance architecture alleged in this Section.

45. Defendants' infringement of Plaintiff's copyrighted works has been continuous and ongoing since the June 2018 premiere. *Yellowstone* has been continuously exploited through multiple seasons (2018-2025), spinoff series including *1883*, *1923*, *Marshals*, and *Dutton Ranch*, streaming distribution on Paramount+ and Peacock, syndication, reruns, international licensing, advertising-based streaming, and merchandise. Under the separate-accrual rule, each of these acts constitutes an independently accruing infringing act that starts a new limitations period. Plaintiff seeks damages for all infringing acts occurring within three years

before the filing of this Complaint and through the verdict of a jury, as well as injunctive relief to prevent Defendants from continuing to infringe Plaintiff's copyrighted works.

46. The following sections organize similarities between *Sovereign Nation* and *Yellowstone* around the four thematic misappropriation categories introduced above: (1) War Over Land and Development; (2) Casino Governance and Development; (3) Character Function Comparisons; and (4) General Themes, Atmosphere, and Total Concept and Feel. The similarities identified herein do not constitute a complete identification of all protectable expression that Defendants copied from Plaintiff's Copyrighted Materials.

**i. War Over Land and Development**

*47.* The land war in both works runs on the same legal machinery. In each, a Native American tribe uses gaming revenue and sovereign land status to expand beyond reservation boundaries; the expansion is made possible by the same concrete mechanism—land held in trust, freedom from county zoning and permitting, and long-term 99-year lease structures—and the expansion collides with neighboring ranching and corporate interests in a multilateral struggle over ownership, development rights, and institutional control. Both works are modern Westerns centered on a family that controls a large swath of frontier land under constant pressure from those it borders—but the shared expression alleged in this category is neither the setting nor the underlying law. It is the dramatic machinery Salkin built from them: the specific staging, sequencing, and narrative deployment alleged below. Numerous plot points, sequences, and concepts in *Yellowstone* closely parallel material contained in Salkin's January 2017 Deck submission to Elevate and the related Copyrighted Materials.

48. The jurisdictional mechanism is specific, and it is the same in both works: (i) sovereign and trust-land status eliminates the zoning and permitting constraints that would otherwise stop large-scale development; (ii) the 99-year lease

structure is the particular workaround that enables development on land an outside party cannot own; and (iii) that leverage is deployed as a recurring narrative device—characters explain it, negotiate around it, and weaponize it—rather than as background exposition. Both works stage the device the same way: through recurring master-plan visualization—architectural models, land surveys, and buildout schematics—revealed at key moments to escalate the conflict, as alleged in detail below. Both works likewise explore a tribe's use of Indian gaming to buy and develop new land and the violent disputes with neighboring landowners that follow, where power groups fight to take land from one another through deceit, corruption, and force.

49. Within this category, the specific correspondences include, but are not limited to: (i) in both works, the tribe's expansion program targets land beyond the reservation's boundaries and is justified, to internal and external audiences alike, through the same sovereignty-and-economics logic; (ii) in both works, the acquisition strategy is executed through purchases, leases, and political pressure, and provokes retaliation from the neighboring interests it displaces; and (iii) in both works, the development program is unveiled through staged reveal scenes—plans presented to a skeptical audience amid protest and internal dissent—as alleged in detail below. *Yellowstone* deploys each of these devices in the same narrative role that Salkin's materials assign them.

50. The works also share a distinctive narrative architecture built from those elements. In both, land functions as identity and cultural inheritance, not merely an asset; a modern sovereignty crisis supplies the story engine; and the conflict escalates through the same sequence—legal maneuvering, political leverage, coercion, and finally violence—among tribal, ranching, and corporate factions. The totality of these parallels exceeds what the Western genre requires and reflects expressive choices, not conventions.

51. Even where individual elements—a Western setting, a land dispute—are

unprotectable in isolation, the particular combination and sequencing alleged above—the sovereignty crisis as narrative engine, the trust-land, no-zoning, 99-year-lease workaround as a recurring plot device, and master-plan visualization as the escalation mechanism—reflects Salkin's expressive choices, and *Yellowstone* reproduces that combination. These similarities are objective and articulable across plot, sequence of events, setting, and theme.

**ii. Casino Governance and Development**

52. In both *Sovereign Nation* and *Yellowstone*, the casino is where power lives. It is the central institution through which tribal governance, development strategy, and political leverage operate—and both works stage that power the same way: through sovereignty speeches delivered from positions of institutional authority, recurring master-plan reveals, and a signature casino-office scene construction.

53. Both works deploy recurring sovereignty and power speeches by tribal leaders serving the same narrative function: establishing jurisdictional authority, framing the development push as an exercise of sovereign rights, and asserting political dominance over external actors. The expressive specificity lies not in the existence of such speeches but in their placement and function—delivered from a position of institutional power within the casino, at the same points in the narrative escalation structure. In *Sovereign Nation*, the Chairman delivers these speeches within the casino complex to allies, opponents, and family members; in *Yellowstone*, Chief Rainwater delivers parallel sovereignty speeches in casino settings across multiple seasons, asserting tribal authority and leveraging it against ranching and corporate interests.

54. Both works employ a master-plan visualization device as a recurring dramatic tool. In the Copyrighted Materials, an architectural model of the "Golden Triangle" development is revealed as the catalyst for governance negotiations and political escalation, and plan materials recur as visual anchors. In *Yellowstone*, architectural models, land surveys, and buildout schematics appear throughout the

series, serving the same function: making territorial power tangible and supplying leverage in development conflicts. The repeated use of physical planning materials as a dramatic device—rather than exposition—is a specific expressive choice shared by both works.

55. Both works build the same institutional world. Each positions the tribal casino not as a commercial backdrop but as (i) the institutional seat of governance, (ii) the operational center of political authority, and (iii) the locus of jurisdictional leverage. In *Yellowstone*, Chief Rainwater conducts governance activity, political negotiation, and development strategy inside the casino throughout the series—paralleling the Copyrighted Materials' depiction of the Chairman's office overlooking the casino floor, with strategic decisions brokered within the casino complex.

56. The jurisdictional mechanism alleged in the preceding category operates inside this world as an active story lever. In both works, sovereign land status and trust-land mechanics are articulated on screen as eliminating zoning and permit constraints and enabling large-scale development through long-term lease arrangements—and in both works that legal framework drives character decisions, shapes power dynamics, and propels escalation, rather than sitting in the background.

57. Certain scenes in *Sovereign Nation*'s Pilot Script also appear in *Yellowstone* with strikingly parallel construction. In both works, the Tribal Chairman's casino office serves as the institutional seat of power, where outside actors negotiate and threaten over casino expansion, land development, and political leverage, and where plans to expand the tribe's land holdings are advanced—including by illicit means.

58. Beyond shared plot elements, both works contain strikingly parallel dialogue and scene-construction choices. These parallels share a common dramatic logic. In the Pilot Script, Tribal Chairman Lyons and Senator Trainor negotiate casino expansion in a scene set in the Chairman's casino office; the discussion centers on the specific legal workaround that trust-land status eliminates zoning and permitting

constraints, enabling large-scale development through a long-term leasing mechanism. In *Yellowstone*, Chief Rainwater and a development partner articulate the identical legal logic—trust land, no zoning, lease structures—to justify casino and hotel expansion on reservation property. Both scenes deploy the same dramatic staging: a powerful tribal leader in a casino office, invoking sovereign jurisdiction as a development weapon, while his interlocutor supplies the political or financial channel to execute the strategy. This is not generic "development talk"; it is (1) a specific jurisdictional workaround articulated on screen, (2) a recurring master-plan vocabulary (rail line, condos, golf, casinos), and (3) the casino office staged as a development war room.

59. Both works also feature casino-office negotiation scenes with strikingly similar construction. In the *Sovereign Nation* Pilot Script, Tribal Chairman Lyons meets with Senator Trainor in "an enormous corner office" inside the casino, where Lyons—described as "a bolo-tie wearing Native American" with "cowboy boots rest[ing] on his ornately expensive desk, where a solid gold name plate tells us his name"—uses a remote to display development plans on "an enormous flat screen monitor." In *Yellowstone* (Season 2, Episode 6), the Tribal Chairman meets with the Beck Brothers in his casino office to discuss land development while casino surveillance screens are visible, and the Chairman's right-hand enforcer Mo is present—the same staging elements and character configuration. In both works, the casino office functions as the institutional seat of power: "negotiation + coercion + policy-level leverage in one place."

60. *Sovereign Nation*'s Deck also grounds the conflict in a named real-world referent: it describes the Koch Brothers' role in oil, real estate, and the exploitation of Native American tribal trust lands, including litigation over billions of dollars in oil revenues allegedly taken from trust land by entities including Koch Industries. *Yellowstone* uses the same brothers scenario with the name changed to the "Beck Brothers": wealthy, powerful white industrialists tied to oil and land development

who operate as external antagonists seeking to leverage or exploit tribal resources and governance. The rename preserves the function—and the sound—of the original.

61. Both works also construct the same two-beat public-announcement architecture as a political turning point in the development conflict. First, the unveiling: in the Pilot Script, the Tribal Chairman presents the Five Stones Amphitheater development to skeptical tribal members while protesters gather outside the meeting venue; in *Yellowstone*, Chief Rainwater presents development plans to a divided council as political and public opposition mounts. Second, the ceremony: the Pilot stages a public groundbreaking at the development site—development as spectacle and political messaging, a proof-of-power act that provokes the next cycle of escalation. Notably, the title of Salkin's Pilot was "Five Stones," and "Five Stones" is the amphitheater at the center of *Sovereign Nation*'s first season. In both works, the announcement is simultaneously a governance act, a public commitment, and a provocation.

**iii. Character Function Comparisons**

62. The striking similarities between the character ensembles in *Sovereign Nation* and *Yellowstone* extend beyond surface-level physical description to the characters' distinctive traits, relationships, and narrative functions—how each character operates within the story's power structure. Each comparison below is grounded in that concrete delineation, not in titles or generic archetypes.

63. Both works employ a materially similar ensemble, arranged in the same configuration around the same conflict: a family leader preserving territorial power; a brilliant but volatile strategist driving the family's political and financial maneuvering; an estranged son whose divided loyalties place him in line for succession; a tribal chairman whose authority runs through the casino; an enforcer who carries out extra-legal acts on the leadership's behalf; and a corporate-political antagonist advancing competing development interests. Table 1 sets out the one-to-one pairings; the delineation supporting each follows.

64. These character parallels are not mere stock types; they are sufficiently delineated figures with physical as well as conceptual qualities that distinguish them from generic Western archetypes and that perform the same narrative functions within each story's power structure.

65. In addition, *Yellowstone* adopted many of the same backstories for its characters as *Sovereign Nation*, as well as Salkin's casting decisions.

| Sovereign Nation (2016) | Yellowstone (2018) | Shared delineation (as alleged below) |
|---|---|---|
| Richard Lyons | Thomas Rainwater | Tribal chairman ruling from a casino office; suit, bolo tie, and cowboy boots; expansion through trust-land leverage and corrupt political allies |
| Dakota Vargas | Kayce Dutton | Exiled young under violent circumstances; returns with outsider skills; a bridge between worlds, embraced only in part by the reservation; designated successor; prone to bursts of violence |
| Karen Falcon | Beth Dutton | Brilliant, damaged strategist with an addiction thread; loyalty to the protagonist drives the political and financial plotting |
| Dante Redhorse | Rip Wheeler | Physically imposing enforcer bound by an extra-legal loyalty code; carries out retribution leadership cannot publicly authorize |
| Tess Whitehorse | Angela Blue Thunder | Female tribal legal strategist; presses succession, development, and governance through institutional leverage; challenges the chairman from inside |
| John Bear | Mo | The chairman's silent protector-advisor; security, counsel, and violence in service of the tribal leader |

**Table 1: The principal character pairings, with the shared delineation alleged in this Section.**

### (a) Kayce Dutton / Dakota Vargas — Concealed Heir

66. In both television series, the male protagonist is a ruggedly handsome man in his 20s, depicted with long hair, and is the son of a powerful figure—though in *Sovereign Nation*, this paternity is initially concealed from Dakota himself. This character's narrative function extends beyond surface traits: in both works, the protagonist serves as the concealed or returning heir—torn between cultures, identities, and communities, and ultimately positioned as the designated successor to institutional power. In both television series, the male protagonist has the same backstory: he was forced to leave home as a young man under mysterious circumstances and has returned home with specific talents crucial to the family's

ambitions. In *Sovereign Nation*, Dakota Vargas left the reservation after he fell in with the wrong crowd and was charged with a murder he did not commit. He returned to the reservation as a successful and polished music promoter and entrepreneur, but he has a fierce intensity and is prone to bursts of violence. In *Yellowstone*, Kayce Dutton left the ranch because his family branded him with an iron for fathering a child with a member of the neighboring reservation. He returned to the ranch many years later as a successful ranch hand, but his military background and unresolved rage also make him prone to bursts of violence. In both television series, the male protagonist is embraced only in part by the Indian reservation because he lacks a Native American bloodline.

**(b) John Dutton / Aunt Shirley**

67. In *Sovereign Nation*, Aunt Shirley is a wealthy Tribal Member and the matriarch of her family line: she receives substantial per-capita payments, lives in a mansion on the reservation, and watches the surrounding landscape—including the casino and her neighbors—from her patio through binoculars, policing the reservation's power dynamics from a position of settled authority. In *Yellowstone*, John Dutton is the ranching patriarch who performs the same old-guard function: he surveys and guards multigenerational landholdings against developers, tribes, and government, controls the resources on which others depend, and decides who succeeds to power. Both are stoic, landed authority figures whose identities are bound to ancestral ground; each commands loyalty and fear, polices territory by watching it, and anchors the story's territorial power structure while shaping and contesting succession.

**(c) Beth Dutton / Karen Falcon**

68. In *Sovereign Nation*, Karen Falcon is a former photojournalist turned music photographer with a troubled past—a recovering alcoholic who serves as Dakota's strategist and confidante, leveraging personal and institutional tools to advance his interests while acting as a destabilizing force within the power conflict.

In *Yellowstone*, Beth Dutton occupies the same position in the architecture: a brilliant corporate strategist and cutthroat negotiator, emotionally volatile and self-destructive, whose addiction threads and fierce loyalty to the family's central figure drive the political and financial plotting. Both are brilliant, damaged women whose loyalty to the protagonist—and whose capacity for calculated destruction—power each series' strategic maneuvering.

**(d) Casting Gil Birmingham as Tribal Chairman**

69. Salkin selected Gil Birmingham for the role of Tribal Chairman Richard Lyons and featured his image in the Deck transmitted to Elevate; the Lyons character is described in the Deck, the Pilot Script, and the Show Bible. *Yellowstone* later cast Birmingham as Thomas Rainwater, the chief of a Native American tribe involved in Indian gaming. That selection predated any public association between Mr. Birmingham and any *Yellowstone* project: no such project had been announced, and no *Yellowstone* casting had been publicly announced, when Salkin submitted her materials. Mr. Birmingham plays a character whose narrative function centers on governance through the casino: a political leader who uses the casino as a command structure for governance, with per-capita economics and jurisdictional leverage flowing through the casino. The character has ambitions to expand the tribe's land beyond the boundaries of the reservation through a series of deals with corrupt politicians and developers. This character is sufficiently delineated with physical as well as conceptual qualities that distinguish him from stock characters of the Western genre. The characters use cunning and a loose moral code to reach their goals. In addition, in both shows, Mr. Birmingham wears a suit, a bolo tie, and cowboy boots—the Pilot Script's own introduction of Lyons in his casino office: "a bolo-tie wearing Native American, solidly built," whose "cowboy boots rest on his ornately expensive desk, where a solid gold name plate tells us his name." (Ex. B-2.)

**(e) Casting Danny Huston as a Corrupt Developer/Conspirator**

70. Salkin's submitted Deck depicted and proposed Danny Huston for the

role of Senator Alan Trainor—the corrupt political operator who supplies the permits, zoning access, and political pathways that enable the tribal development agenda. *Yellowstone* later cast Huston as Dan Jenkins, the land developer entangled in the same conflict. The Pilot Script stages Trainor's function in dialogue: pressed by Lyons—"Alan, are my plans going to get approved?"—Trainor recites the machinery he controls, "zoning issues, permits, regulations, outright laws, waivers, indemnities. The BIA," and names his leverage: "My price is whatever I say it is, and I say: it just went up." (Ex. B-2.) The proposal predated any public association between Mr. Huston and any *Yellowstone* project: no such project had been announced, and no *Yellowstone* casting had been publicly announced, when Salkin submitted her materials. Huston's character serves a materially similar structural function in both works: a development power broker and institutional leverage operator who supplies the political or commercial pathway for development. In *Yellowstone*, Huston's character is a land developer; in *Sovereign Nation*, he is a state senator. The character arc is parallel in both: although his scheming initially produces results, the character is ultimately killed when he double-crosses the wrong people. Both works depict this character as slick, well-polished, and attractive, with an expensive suit and watch and the look of a politician. This character is not a stock character of the Western genre.

**SOVEREIGN NATION DECK**
as submitted January 2017



Photograph of Danny Huston, depicted among the "Principal Characters" — proposed casting for **Senator Alan Trainor**
Deck p. 6 — Exhibit B, p. 8 of 82

**YELLOWSTONE**
as premiered June 20, 2018

**"a city-slicker developer (Danny Huston)"**
USA Today, June 20, 2018

**Cast as Dan Jenkins — the land developer**
entangled in the tribal land-and-development conflict

"the instantly hissable villain is a developer, Dan Jenkins (Danny Huston)"
The Oregonian / OregonLive, June 15, 2018

**Figure 3: Danny Huston — depicted in Salkin's submitted Deck (Deck p. 6; Ex. B p. 8 of 82) as proposed casting for Senator Alan Trainor; cast by Yellowstone as developer Dan Jenkins.**

*71.* These casting decisions constitute powerful circumstantial evidence of copying. The Deck that Salkin transmitted to Elevate depicted and proposed Danny Huston for the role of Senator Alan Trainor and featured Gil Birmingham, Salkin's selection for the role of Tribal Chairman Richard Lyons. Neither selection was public knowledge when Salkin submitted her materials: *Yellowstone* had not been announced, and no casting had been publicly announced. Contemporaneous press confirmed the parallel at the series' launch: the Associated Press introduced Birmingham's character as "a tribal chief and casino owner," and national reviews identified Huston as the developer driving the land conflict. The fact that Salkin's submitted Deck depicted Huston and featured Birmingham, and both actors subsequently appeared together in *Yellowstone* in roles serving materially similar structural functions—Birmingham as the tribal political leader who uses the casino as a command structure for governance, and Huston as the development power broker and institutional leverage operator—is circumstantial evidence supporting access and copying.

**SOVEREIGN NATION PILOT SCRIPT**
registered Nov. 2016; submitted Jan. 2017 (Ex. B-2)

**INT. AN ENORMOUS CORNER OFFICE**

*"The office of casino's TRIBAL CHAIRMAN RICHARD LYONS (50's), a bolo-tie wearing Native American, solidly built. His cowboy boots rest on his ornately expensive desk, where a solid gold name plate tells us his name."*

Pilot Script — the Chairman's introduction

The role Salkin selected Gil Birmingham to play:
**Tribal Chairman Richard Lyons**
described in the Deck (p. 6), the Pilot Script, and the Show Bible

**YELLOWSTONE**
as premiered June 20, 2018



**Gil Birmingham as Chairman Thomas Rainwater**
**"a tribal chief and casino owner"**
Associated Press, June 19, 2018
(photo: Emerson Miller / Paramount Network via AP)

**Figure 4: Gil Birmingham — the Pilot Script's Tribal Chairman (Ex. B-2), the role for which Salkin selected Birmingham; cast by Yellowstone as Chairman Thomas Rainwater (AP, June 19, 2018).**

### (f) Rip Wheeler / Dante Redhorse

72. In *Sovereign Nation*, Dante Redhorse is a beefy, burly, unshaven man in his 30s with long hair and dirty clothes—a rugged biker type always primed for a fight. He is the soon-to-be leader of The Descendants Biker Gang, Dakota's longtime rival, and an enforcer tied to the Redhorse family's territorial interests. In *Yellowstone*, Rip Wheeler fills the same role—a fiercely loyal enforcer whose willingness to use intimidation and violence protects the family's power. Both characters project physical dominance, enforce territorial control, intimidate rivals, and carry out acts of retribution that the central leadership cannot publicly authorize.

### (g) Angela Blue Thunder / Tess Whitehorse

73. In *Sovereign Nation*, Tess Whitehorse is the Casino Treasurer of Indian Hills Casino and holds a law degree—a stunning Native American woman in her 40s with dark hair, often dressed in a tailored black Chanel suit and pearls. She uses charm, connections, and political access to shape tribal governance and casino expansion, including lobbying in Washington, D.C., and she has a complex relationship with Tribal Chairman Rich Lyons, repeatedly challenging his decisions

through institutional channels rather than brute force. In *Yellowstone*, Angela Blue Thunder performs the same function: a formidable Native American attorney who counsels Chief Rainwater, presses an aggressive legal-political strategy for reclaiming land and power, and challenges the chairman's approach from inside the tribe's own power structure. Both are sophisticated tribal legal strategists who influence succession, development, and governance through political and legal leverage rather than direct authority.

**(h) Mo / John Bear**

74. Distinct from the enforcer role above, both series feature a trusted security-focused advisor who protects and counsels the tribal leader. In *Sovereign Nation*, John Bear serves as head of casino security—a solid, silent, and very threatening presence who functions as Rich Lyons' trusted protector, advisor, and strongman, and who, as the series unfolds, proves capable of far more than casino security, up to and including burying bodies in the desert. In *Yellowstone*, Mo (portrayed by Mo Brings Plenty) fills the same role as Chief Rainwater's personal security, intelligence operative, and confidant. Both are quiet, capable figures who provide protection, strategic counsel, and, when necessary, violence in service of the tribal leader.

75. The foregoing character comparisons are illustrative and do not constitute a complete identification of all character similarities between *Sovereign Nation* and *Yellowstone*. Additional character parallels, including secondary and recurring characters, are documented in Plaintiff's evidentiary submissions and will be further developed through discovery.

**iv. General Themes, Atmosphere, and Total Concept and Feel**

76. The specific plot, character, scene, dialogue, and structural similarities detailed above are reinforced by a shared expressive frame. *Sovereign Nation* and *Yellowstone* share coordinated choices in visual style, atmosphere, opening construction, and thematic preoccupation—and those choices recur in patterns too

specific and too numerous to be coincidental. This category corroborates the concrete parallels alleged above; the comparisons that follow illustrate it.

77. Both works further share a distinctive visual and atmospheric palette. In the Pilot Script, the series opens with a helicopter-approach establishing shot over the reservation, revealing a landscape that juxtaposes desert poverty with gleaming casino wealth—a visual statement of the dispossession and aspiration that define the narrative. The opening scene and dialogue in *Sovereign Nation* address how the U.S. Government leased land back from Native Americans via President Eisenhower's Equalization Bill—immediately establishing the historical and legal framework of tribal land rights that drives the series' central conflict. In *Yellowstone*, Sheridan deploys a strikingly parallel narrative opening: the second scene of the series depicts Attorney Jamie Dutton standing in a Montana courthouse, pleading his case about land development, Bureau of Land Management jurisdiction, and zoning disputes.

78. Both works thus use their opening sequences to establish, from the very first minutes, that land—its ownership, its legal status, and the governmental mechanisms that control it—will be the battlefield upon which the series' conflicts unfold. This parallel framing device is a highly specific expressive choice: both works deploy early scenes to set the narrative stakes as a war over land development between feuding parties. *Yellowstone* employs the same visual grammar throughout its run: sweeping aerial landscape shots that juxtapose the vast Western frontier against institutional power structures—ranch compounds, reservation properties, and development sites—to frame the central sovereignty conflict.

79. In addition, both works depict: (a) a murder on tribal land that triggers a cascade of escalating events across multiple episodes; (b) a bar fight involving gang or enforcer elements; (c) an emotionally charged grave-digging sequence; (d) a large-scale explosion set piece; (e) a formal public groundbreaking ceremony staged as political escalation in the land-development conflict; (f) tribal–corporate–ranching political negotiation scenes staged in wide-vista Western landscapes; and (g) a mixed-

heritage child who symbolizes the identity conflict at the heart of both narratives. The recurring master-plan visualization alleged above completes this shared visual grammar.

80. Both works also share a parallel political succession structure. Both works organize the central conflict around the question of who inherits institutional power, through what mechanism, and under what resistance. In *Sovereign Nation*, Dakota Vargas is revealed as the concealed illegitimate son of Tribal Chairman Lyons and secretly plots to capture the chairmanship, while rival operators—including the wealthy matriarch Aunt Shirley and institutional challenger Tess Whitehorse—contest that ascent through political and financial mechanisms. In *Yellowstone*, John Dutton designates Kayce as his successor and pressures him toward that role, while governance power becomes the narrative prize through Dutton's political rise and internal operators leverage formal legal channels to engineer political outcomes. The specific structural parallels include: (i) a concealed or returning heir positioned toward capture of institutional authority; (ii) institutional challengers shaping and contesting that ascent through legal and political mechanisms; (iii) a matriarch or patriarch gatekeeper controlling resources and succession dynamics; and (iv) governance office as the narrative prize. This is not a generic "family conflict" premise; it is a specific, protectable expressive sequence that *Yellowstone* copied from Salkin's copyrighted materials.

81. Even where individual elements such as "Western setting," "family dynasty," or "land dispute" are unprotectable in isolation, the particular combination and sequencing of these elements across all four thematic categories—land-development conflict, casino-centered governance leverage, the specific ensemble of delineated characters deployed in similar narrative functions, and the coordinated visual and atmospheric choices—constitutes protectable expression that Defendants wrongfully appropriated. These similarities are objective and articulable, and they arise in common patterns across every category.

82. When viewed in their totality, the similarities in plot, themes, dialogue, mood, setting, pace, characters, and sequence of events between the works—illustrated through the four categories described above—are so extensive, and arise in such common patterns, that they support only one reasonable inference: copying.

83. Salkin has been damaged, and continues to be damaged, by Defendants' unauthorized use of her Copyrighted Materials. Unless these acts are restrained by this Court, they will continue to cause irreparable injury to Salkin and to the public for which there is no adequate remedy at law.

84. Plaintiff will suffer irreparable harm if Defendants are permitted to continue exploiting the *Yellowstone* franchise without authorization because: (a) each additional broadcast, stream, or distribution of *Yellowstone* constitutes a separate act of infringement that cannot be undone; (b) Defendants' continued exploitation has caused and will continue to cause Plaintiff to lose the ability to license her Copyrighted Materials to competing productions, as potential licensees will view the market as saturated by *Yellowstone*; (c) the ongoing exploitation of Plaintiff's creative expression without credit or compensation has diminished and continues to diminish the value and marketability of *Sovereign Nation*; and (d) money damages cannot adequately compensate Plaintiff for the ongoing misappropriation of her creative vision because the harm to her reputation and creative opportunities is inherently difficult to quantify.

85. The balance of hardships favors Plaintiff because Defendants have no legitimate interest in continuing the unauthorized exploitation of Plaintiff's protected expression, while continued exploitation compounds the market and reputational harms alleged above. Public interest favors injunctive relief because copyright law's purpose of incentivizing creativity is undermined when infringers are permitted to continue profiting from unauthorized appropriation of protected expression.

86. Plaintiff seeks prospective relief directed at Defendants' continuing and future exploitation of the works alleged to infringe Plaintiff's copyrights. Defendants

continue to produce, distribute, license, stream, broadcast, and otherwise exploit *Yellowstone*, its spinoff series, and related works, and the alleged infringement remains ongoing. Plaintiff does not seek to unwind completed past exploitation, but seeks prospective relief directed at Defendants' continuing and future infringement.

**FIRST CAUSE OF ACTION**

**Copyright Infringement**

*Against the Direct Defendants*

87. Plaintiff realleges and incorporates by reference all matters alleged in Paragraphs 1 through 86 of this Complaint.

88. Plaintiff owns valid and subsisting copyrights in the Copyrighted Materials. The registered works asserted as infringed in this action are: (a) *Sovereign Nation*, Registration No. TXu002011973, effective April 12, 2016, the deposit for which comprised the Pilot Script, Show Bible, and Deck; and (b) the *Sovereign Nation* Pilot Script, Registration No. PAu003843317, effective November 8, 2016. In the alternative, and solely to the extent the Show Bible is not covered by Registration No. TXu002011973, Plaintiff asserts Registration No. PAu003870824, effective August 15, 2017, which registers the Show Bible as revised on March 8, 2017. The two primary asserted registrations, TXu002011973 and PAu003843317, were effective before the alleged submission and copying; PAu003870824 is pleaded solely in the alternative as to the Show Bible.

89. Registration Nos. TXu002011973 and PAu003843317 became effective on April 12, 2016 and November 8, 2016, respectively, months before the *Sovereign Nation* submission first reached Sheridan's representatives and well before any infringing conduct is alleged to have begun. Because those registrations were effective before the alleged infringement commenced, Plaintiff may elect statutory damages under 17 U.S.C. § 504(c), including enhanced statutory damages under 17 U.S.C. § 504(c)(2) for willful infringement, and seeks reasonable attorneys' fees and costs under 17 U.S.C. § 505; 17 U.S.C. § 412 does not bar those remedies with respect

to the works covered by those registrations. Alternatively, Plaintiff seeks her actual damages and Defendants' profits attributable to the infringement under 17 U.S.C. § 504(b). Defendants' infringement is continuing: each unauthorized reproduction, distribution, public performance, and preparation of derivative works gives rise to a separately accruing claim, and this action seeks remedies for acts of infringement within the applicable limitations period, together with the profits attributable to them.

90. Defendants Sheridan, Elevate, Bosque Ranch, John Linson, Linson Entertainment, Paramount Global, and Viacom (collectively, the "Direct Defendants") are named on this Cause of Action. Plaintiff personally created and developed the Copyrighted Materials and owns the copyright interests asserted in this action. Plaintiff is a named copyright claimant on each asserted registration, including Registration No. TXu002011973, which also identifies Plaintiff's company, Luma Vision Entertainment, LLC, as a copyright claimant. Plaintiff is entitled to enforce the exclusive rights asserted in this action.

91. Defendants had access to Plaintiff's Copyrighted Materials for *Sovereign Nation* through Elevate and copied original elements therefrom to create *Yellowstone*. The documentary record shows that Salkin provided the Pilot Script, Show Bible, and Deck to her agent for submission; the agent contacted Sheridan's representatives at Elevate by telephone and in writing; Salkin directly submitted the Deck to Elevate; Elevate confirmed receipt and internal forwarding; and Elevate responded on Sheridan's behalf. Both the agent and Salkin's manager informed Salkin that they had transmitted Copyrighted Materials to Elevate, the agent reporting transmission of the Pilot Script, Show Bible, and Deck, and, on information and belief, the manager transmitting the Pilot Script and Show Bible. *See* Exhibits A and C. These facts support a reasonable inference of access. Copying is established where a defendant had access and the two works are substantially similar in their protected elements. Plaintiff's works and Defendants' works are substantially similar: when the specific expressive elements of each work are objectively compared, articulable similarities

emerge across plot, themes, dialogue, mood, setting, pace, characters, and sequence of events. Moreover, an ordinary, reasonable audience would find that *Yellowstone* captures the total concept and feel of *Sovereign Nation*, not merely sharing a Western genre but constituting a dramatization of Plaintiff's creative vision. The substantial similarities detailed in this Complaint involve protectable elements of Plaintiff's original expression, not merely unprotectable ideas, stock characters, or genre conventions.

92. At no time has Plaintiff authorized Defendants to copy, reproduce, adapt, distribute, or utilize in any way her copyrighted works.

93. On information and belief, Defendant Sheridan was the co-creator, director, writer, and/or the moving, active conscious force behind the infringing conduct and derived financial benefit from the infringing conduct.

94. On information and belief, Defendant John Linson, as co-creator and executive producer of *Yellowstone*, participated directly in the creation of the infringing work by collaborating with Sheridan on the development of the series' characters, storylines, and creative direction, and by making editorial and creative decisions that incorporated Plaintiff's copyrighted expression into the final work. John Linson is publicly credited as a co-creator of *Yellowstone* and received "created by" credit across the series and "story by" credits on early episodes. On information and belief, John Linson was involved in the earliest development stages of *Yellowstone* and worked alongside Sheridan in selecting the show's themes, characters, and narrative structure—creative choices that closely parallel Plaintiff's Copyrighted Materials. Defendant Linson Entertainment, as John Linson's production company, was the vehicle through which he exercised creative control over the development and production of *Yellowstone* and directly participated in the creation of the infringing work.

95. On information and belief, Defendants Paramount Global and Viacom, through their executives, creative personnel, and production departments, participated

directly in the development and creation of *Yellowstone* by greenlighting the series in or around May 2017, providing creative notes and feedback that shaped the series' characters and storylines, approving scripts incorporating Plaintiff's copyrighted expression, and exercising ongoing creative oversight throughout the development and production process. Paramount Network announced the series order in May 2017, shortly after the January 2017 submission to Elevate, and Paramount's development executives were involved in shaping the creative direction of the series from its inception.

96. On information and belief, Defendant Elevate, as Sheridan's management company, participated in the development and exploitation of *Yellowstone* after receiving and internally forwarding Plaintiff's *Sovereign Nation* submission. Elevate had actual knowledge of the Copyrighted Materials: it received the Deck directly from Plaintiff; its personnel communicated with Plaintiff's agent, who reported transmitting the Pilot Script, Show Bible, and Deck to Elevate; and, on information and belief, it received the Pilot Script and Show Bible from Plaintiff's manager as well. Elevate confirmed receipt in writing and responded on Sheridan's behalf. On information and belief, Elevate thereafter materially facilitated Sheridan's use of the submitted material and the development and commercial exploitation of *Yellowstone*. Elevate's alleged liability is based on that later conduct, not on its authorized receipt or internal forwarding of Plaintiff's submission standing alone. *See* Exhibits A and C.

97. Each of these Defendants engaged in volitional conduct that caused the creation of the infringing work. Defendants' aforementioned conduct infringes and will continue to infringe the exclusive rights belonging to the Plaintiff as owner of the copyrights.

98. As a direct and proximate cause of Defendants' wrongful conduct, Plaintiff is informed and believes, and based thereon alleges, that she has suffered and will continue to suffer injury and damages in an amount to be determined at trial, and

that Defendants have realized and continue to realize profits and other benefits rightfully belonging to Plaintiff which should be disgorged to Plaintiff. Defendants' profits subject to disgorgement include, but are not limited to: (a) production fees and executive producer compensation paid to Defendants Sheridan, John Linson, Bosque Ranch, and Linson Entertainment; (b) management fees, commissions, and other compensation received by Defendant Elevate in connection with its representation of Sheridan and the *Yellowstone* franchise; (c) licensing fees received by Defendants Paramount Global and Viacom from domestic and international distribution; (d) subscription and advertising revenue attributable to *Yellowstone* viewership on Paramount+ and Peacock; (e) syndication and rerun fees; (f) merchandise revenue; (g) franchise extension revenue from spinoff series including *1883*, *1923*, *Marshals*, and *Dutton Ranch*; and (h) residual payments. Plaintiff is entitled to all of Defendants' profits attributable to the infringement pursuant to 17 U.S.C. § 504(b), and Defendants bear the burden of proving their deductible expenses and apportioning profits attributable to factors other than the copyrighted work. Accordingly, Plaintiff seeks an award of her actual damages and Defendants' profits pursuant to 17 U.S.C. § 504(b). Alternatively, Plaintiff reserves the right to seek statutory damages for Defendants' intentional infringement of her copyrighted works.

99. Certain Defendants' infringement was willful, entitling Plaintiff to enhanced statutory damages of up to $150,000 per work infringed under 17 U.S.C. § 504(c)(2).

100. Defendant Sheridan's infringement was willful. On information and belief, Sheridan had actual knowledge of and access to the *Sovereign Nation* submission through Elevate. Elevate received the submission, internally forwarded it, and responded on Sheridan's behalf. Despite this knowledge, Sheridan created a substantially similar work covering identical subject matter without any apparent effort to verify rights or investigate potential conflicts. This conduct demonstrates willful infringement or, at minimum, reckless disregard for Plaintiff's rights. Plaintiff

seeks enhanced statutory damages against Defendant Sheridan under 17 U.S.C. § 504(c)(2). *See* Exhibits A and C.

101. Defendant Elevate's infringement was also willful. Elevate had actual knowledge of Plaintiff's Copyrighted Materials: it received the Deck directly from Plaintiff; its personnel communicated with Plaintiff's agent, who reported transmitting the Pilot Script, Show Bible, and Deck to Elevate; and, on information and belief, it received the Pilot Script and Show Bible from Plaintiff's manager as well. Elevate confirmed receipt in writing, internally forwarded the submission for Sheridan's consideration, and responded on Sheridan's behalf. On information and belief, Elevate thereafter continued to represent Sheridan and knowingly facilitated the development and exploitation of *Yellowstone*. Plaintiff seeks enhanced statutory damages against Defendant Elevate under 17 U.S.C. § 504(c)(2).

102. Defendant Bosque Ranch's infringement was willful because Bosque Ranch is owned and controlled by Defendant Sheridan and, on information and belief, participated in developing and producing *Yellowstone* with knowledge of the *Sovereign Nation* submission. Plaintiff seeks enhanced statutory damages against Defendant Bosque Ranch under 17 U.S.C. § 504(c)(2).

103. On information and belief, the infringement by Defendants John Linson and Linson Entertainment was also willful. As co-creator and executive producer of *Yellowstone*, Defendant John Linson worked closely with Sheridan throughout the development of *Yellowstone* and had access to the creative materials underlying the series. Given John Linson's direct creative collaboration with Sheridan after the *Sovereign Nation* submission reached Elevate, and given the striking and pervasive similarities between *Sovereign Nation* and *Yellowstone*, John Linson either knew or was willfully blind to the fact that *Yellowstone* was derived from Plaintiff's copyrighted work.

104. Moreover, the substantial similarities between *Sovereign Nation* and *Yellowstone* in subject matter, narrative structure, and character construction,

combined with industry-standard practices requiring copyright clearance investigations before major productions, gave these Defendants constructive knowledge of the potential infringement. On information and belief, these Defendants were also aware of Plaintiff's claims no later than January 2020, when Plaintiff's counsel sent Defendants a demand letter enclosing her Pilot Script and asserting her copyright claims. Viacom's counsel responded on February 24, 2020. Despite this notice, these Defendants continued to participate in the exploitation of the infringing franchise. Plaintiff is therefore entitled to enhanced statutory damages against Defendants John Linson and Linson Entertainment under 17 U.S.C. § 504(c)(2).

105. Defendants Paramount Global and Viacom's infringement was willful, at a minimum, after January 2020. In that month, Plaintiff sent a demand letter to Defendants asserting her copyright claims. Viacom's counsel responded on February 24, 2020, on behalf of Viacom and Sheridan, acknowledging receipt of the demand and the existence of the dispute. Despite this express notice of Plaintiff's claims, Defendants Paramount Global and Viacom continued to exploit the *Yellowstone* franchise without authorization, producing additional seasons, greenlighting spinoff series including *1883*, *1923*, *Marshals*, and *Dutton Ranch*, expanding streaming distribution on Paramount+ and Peacock, and generating billions of dollars in additional revenue from Plaintiff's copyrighted expression. This continued exploitation with actual knowledge of Plaintiff's claims constitutes willful infringement or, at minimum, reckless disregard for Plaintiff's rights. Plaintiff is therefore entitled to enhanced statutory damages against Defendants Paramount Global and Viacom.

106. Pursuant to 17 U.S.C. § 507(b), Plaintiff's claims for damages are timely as to all infringing acts occurring within three years before the filing of this Complaint. Because Defendants have continuously exploited the *Yellowstone* franchise through new seasons, spinoffs, streaming distribution, syndication, and merchandise from 2018 to the present, each such act of exploitation constitutes a

separately accruing claim. Laches cannot bar Plaintiff's claims for legal damages brought within the applicable limitations period.

107. Defendants' infringing conduct has caused and is causing substantial irreparable injury and damage to Plaintiff in an amount not capable of determination, and, unless restrained, will cause further irreparable injury, leaving the Plaintiff with no adequate remedy at law.

**SECOND CAUSE OF ACTION**

**Vicarious Copyright Infringement**

*Against the Vicarious Defendants*

108. Plaintiff realleges and incorporates by reference all matters alleged in Paragraphs 1 through 107 of this Complaint.

109. Defendants John Linson, Art Linson, Bosque Ranch, Linson Entertainment, Paramount Global, Viacom, and 101 Studios (the "Vicarious Defendants") each had the right and ability to supervise Sheridan's infringing conduct and a direct financial interest in the infringing activity. Vicarious infringement is a strict liability tort that does not require proof of knowledge or intent. A defendant infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it.

110. On information and belief, Defendant John Linson, as co-creator and executive producer of *Yellowstone*, had the contractual right and practical ability to supervise the creative content of the series, including the authority to approve scripts, provide creative notes, require changes to storylines and characters, and exercise editorial control over the show's creative direction. On information and belief, Defendant Art Linson, as executive producer of *Yellowstone*, had the contractual right and practical ability to supervise the production of the series and to stop the use of infringing material. Both Linsons possessed the power to prevent the infringement but failed to exercise that power.

111. On information and belief, Defendant Bosque Ranch, as Sheridan's

production company and a co-producer of *Yellowstone*, had the contractual right and practical ability to supervise the creative content of the series. Bosque Ranch possessed the authority to approve or reject creative materials used in the production and to ensure compliance with third-party intellectual property rights. Defendant Linson Entertainment, as John Linson's production company and a co-producer of *Yellowstone*, similarly had the contractual right and practical ability to supervise the series' creative content through its production agreements and creative oversight role.

112. On information and belief, Defendants Paramount Global and Viacom, as the network and parent company that commissioned, financed, and broadcast *Yellowstone*, had the contractual right and practical ability to supervise the series' creative content. Paramount exercised ongoing creative oversight, including the authority to approve scripts, provide creative notes, greenlight storylines, and require changes to creative content. Paramount and Viacom possessed the power to condition continued production on compliance with copyright clearance requirements but failed to exercise that power.

113. On information and belief, Defendant 101 Studios, as a production company that financed and produced *Yellowstone*, had the contractual right and practical ability to supervise the creative content of the series, including the authority to approve scripts, provide creative notes, and require changes to storylines and characters.

114. The defendant, not the copyright owner, bears the burden of affirmatively guarding against infringement. Turning a blind eye to detectable acts of infringement for the sake of profit gives rise to liability.

115. On information and belief, the Vicarious Defendants derived substantial direct financial benefit from Sheridan's infringing conduct. Financial benefit exists where the availability of infringing material acts as a draw for customers. *Yellowstone* directly drives subscribers to Paramount+ and Peacock, advertising revenue to Paramount Network, and merchandise purchases. Defendants John Linson and Art

Linson received executive producer fees and backend compensation tied to *Yellowstone*'s commercial success. Defendant 101 Studios received production fees, distribution revenue, and backend compensation as a production company and distributor of *Yellowstone*, deriving substantial direct financial benefit from the exploitation of the infringing work. The remaining corporate Vicarious Defendants—Bosque Ranch, Linson Entertainment, Paramount Global, and Viacom—profited through production fees, advertising revenue, subscription fees, licensing agreements, syndication, and streaming distribution.

**THIRD CAUSE OF ACTION**

**Contributory Copyright Infringement**

*Against the Contributory Defendants*

116. Plaintiff realleges and incorporates by reference all matters alleged in Paragraphs 1 through 115 of this Complaint.

117. Defendants Bosque Ranch, John Linson, Art Linson, Linson Entertainment, Paramount Global, Viacom, 101 Studios, and Elevate (the "Contributory Defendants") had knowledge of the infringing activity and materially contributed to it, or alternatively, actively induced Sheridan's infringing activity. One who, with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another, may be held liable as a contributory infringer.

118. On information and belief, Sheridan received or had access to Plaintiff's Copyrighted Materials through Elevate in late 2016 and early 2017, and thereafter created a substantially similar work with the assistance of the Contributory Defendants.

119. Elevate had actual knowledge of Plaintiff's Copyrighted Materials: it received the Deck directly from Plaintiff; its personnel communicated with Plaintiff's agent, who reported transmitting the Pilot Script, Show Bible, and Deck to Elevate; and, on information and belief, it received the Pilot Script and Show Bible from

Plaintiff's manager as well. Elevate confirmed receipt in writing, internally forwarded the submission for Sheridan's consideration, and responded on Sheridan's behalf. On information and belief, Elevate thereafter continued to represent Sheridan and knowingly facilitated the development and exploitation of *Yellowstone* without disclosing or addressing the prior submission, thereby actively enabling and encouraging the infringement.

120. Defendant Bosque Ranch is Sheridan's own production company, and Sheridan's intent to infringe is directly attributable to Bosque Ranch. John Linson, as co-creator and executive producer of *Yellowstone*, worked closely with Sheridan throughout the development process and participated in the creative decisions that resulted in the appropriation of Plaintiff's Copyrighted Materials. On information and belief, Art Linson, as executive producer, provided production support and oversight for *Yellowstone* and materially contributed to the production and exploitation of the infringing work.

121. The Contributory Defendants materially contributed to Sheridan's infringing conduct. Paramount Global, Viacom, and 101 Studios provided financing, production infrastructure, distribution platforms, and promotional support necessary to bring *Yellowstone* to fruition, transforming an infringing script into a multi-billion-dollar franchise.

122. Bosque Ranch and Linson Entertainment provided creative and production support. John Linson, as co-creator and executive producer, was directly involved in the creative development of *Yellowstone*. Art Linson, as executive producer, provided production support. Elevate facilitated access to Plaintiff's Copyrighted Materials and continued to represent Sheridan throughout the development of *Yellowstone*.

123. On information and belief, the Contributory Defendants were aware of or should have been aware of Plaintiff's claims no later than January 2020, when Plaintiff sent a demand letter asserting her copyright claims, with Viacom's counsel

responding on February 24, 2020, acknowledging the dispute, yet continued to participate in and promote the exploitation of the infringing franchise through additional seasons, spinoff series, and expanded distribution. This continued promotion and exploitation with knowledge of Plaintiff's claims constitutes active encouragement of infringement.

124. Without the Contributory Defendants' material contributions and inducement, Sheridan's infringement could not have occurred on the massive commercial scale that it did. Inducement liability attaches where a defendant continues to facilitate and promote infringing activity after receiving notice.

125. Alternatively, and in addition to active inducement, the Contributory Defendants were willfully blind to Sheridan's infringing activity. Willful blindness establishes knowledge for contributory liability where a defendant (1) subjectively believed that infringement was likely occurring and (2) took deliberate actions to avoid learning about that infringement.

126. The Contributory Defendants subjectively believed that infringement was likely: industry-standard practice requires copyright-clearance investigations before greenlighting major productions, and the obvious similarities between *Sovereign Nation* and *Yellowstone* would have raised red flags during any competent clearance process. On information and belief, rather than conduct appropriate due diligence that would have revealed Plaintiff's prior submission to Sheridan's representatives at Elevate, the Contributory Defendants proceeded with production without investigating the provenance of Sheridan's creative materials. This willful blindness demonstrates the intent required for contributory liability and supports enhanced statutory damages under 17 U.S.C. § 504(c)(2).

## FOURTH CAUSE OF ACTION

### Direct Copyright Infringement—Reproduction and Distribution

*Against NBCUniversal and Alliance Entertainment*

127. Plaintiff realleges and incorporates by reference all matters alleged in

Paragraphs 1 through 126 of this Complaint.

128. Defendants NBCUniversal and Alliance Entertainment directly infringed Plaintiff's copyrighted works by reproducing, distributing, and exploiting *Yellowstone* without authorization. Direct infringement of the reproduction right requires that the defendant cause the copying. Infringement of the distribution right requires actual dissemination of copies to the public.

129. NBCUniversal made independent, volitional decisions to reproduce and distribute *Yellowstone*. NBCUniversal negotiated licensing agreements to acquire streaming rights, caused copies to be created and stored on its servers, and transmitted those copies to millions of Peacock subscribers. Unlike passive intermediaries that merely index or link to third-party content, NBCUniversal hosts actual copies and directly transmits them to end users—conduct that constitutes actual dissemination under Ninth Circuit precedent.

130. Alliance Entertainment likewise made independent, volitional decisions to manufacture, reproduce, and distribute physical copies of *Yellowstone*. Alliance Entertainment manufactured DVDs, Blu-ray discs, and other physical media and distributed those copies through retail and wholesale channels throughout the United States, satisfying the actual dissemination requirement. *See* 17 U.S.C. § 106(3).

131. The reproduction and distribution activities of NBCUniversal and Alliance Entertainment constitute direct infringement of Plaintiff's exclusive rights under 17 U.S.C. § 106(1) and (3). Neither defendant obtained authorization from Plaintiff to reproduce or distribute *Yellowstone*, which incorporates Plaintiff's copyrighted expression.

132. As a direct and proximate result of the direct infringement by NBCUniversal and Alliance Entertainment, Plaintiff has suffered and continues to suffer damages in an amount to be proven at trial. Plaintiff seeks disgorgement of these defendants' profits attributable to the infringement pursuant to 17 U.S.C. § 504(b).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1. Judgment that Defendants infringed Plaintiff's copyrights and, as applicable, that such infringement was willful;

2. Appropriate injunctive relief pursuant to 17 U.S.C. § 502 preventing continuing and future infringement of Plaintiff's copyrights;

3. At Plaintiff's election, either (a) Plaintiff's actual damages and Defendants' profits attributable to the infringement pursuant to 17 U.S.C. § 504(b), including an accounting as appropriate; or (b) statutory damages pursuant to 17 U.S.C. § 504(c), including enhanced statutory damages under § 504(c)(2);

4. Reasonable attorneys' fees and costs pursuant to 17 U.S.C. § 505;

5. Prejudgment and post-judgment interest as permitted by law; and

6. Such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury of all issues so triable in this action.

Respectfully submitted,

Dated: August 19, 2026 STINSON LLP

By: /s/ Ashlev R. Fickel

Ashley R. Fickel

Attorneys for Plaintiff
Lauren J. Salkin